All right, I guess we have different counsel on this one, don't we? This is Courtland v. Union Carbide, and this will be number two and four. And Mr. Donovan's arguing this, right? All right. May it please the Court, Your Honor. Michael Donovan, on behalf of the plaintiff, the Courtland Corporation, who commenced a citizen suit action as private attorney general against Union Carbide in a case unlike any that has ever been seen in a federal court before. This situation, this set of facts that is presented by the existence of the Philmont facility and its impact on Courtland Corporation So are you doing two or four, both of them together? I beg your pardon? Are you doing number two or number four, or both together here? Both together at the outset, Your Honor. My intent in this argument is to address three legal issues. Those legal issues include whether, in fact, and at law, the Philmont facility is an open dump under West Virginia law. Number two, to address the question of whether and to what extent the liability under contribution provisions of CERCLA are properly applied in this case. All right. Can you just take 30 seconds to tell us what your claim is for number two and what your claim is for number four so we're sure we're on the same page? Claim for number two is for the abatement of the conditions existing and emanating from the Philmont facility for the abatement of the hazardous substances, the releases and threatened releases of hazardous substance into the environment from the Philmont facility. And as the statute defines the term facility, it's imperative that this court recognize Are you arguing liability? I'm having a little trouble. I thought this was basically remedies cases. Both, Your Honor. They are inextricably intertwined. I understand, but I don't think we should be re-arguing the liability, should we? I mean, for instance, the first issue raised was whether the cost for the kayak trip were afforded. The second was contribution for 25 percent of the cost was an issue that you raised. I mean, you have seven different issues you raised, and I don't quite understand how you're talking about it. The issue, the prime issue here, Your Honor, is the question of whether it is, in fact, an open dump under West Virginia law and what the proper remedy for that. What does that relate to? Is that a question that goes to liability or to remedy? Both, Your Honor. Hold on a second. I thought the case was bifurcated, and you had one and three as the liability determinations, and then the others were remedies. Is that incorrect? No, Your Honor, that is not correct. Why don't you explain what two and four are about? Two involves the liability emanating from Philmont, from the Philmont facility, and the liability and remedy for the violations that exist at Philmont. Okay, fair enough. Four addresses the southern boundary ditch and those that emanate from there. And it's key that this Court understand, it is imperative this Court understand, that the conditions that exist and emanate from Philmont are unique, and, in fact, I stand before you at 40 years of enforcing state and federal environmental laws before the courts tell you it's egregious and unprecedented in any court. We've got a district court judge here who's seen a few days pass, too, right? He sort of saw all this and was able to make sort of these sort of determinations. I appreciate your 40 years, but if we're going to start comparing years, I'm not sure that's going to go to your benefit here, given the district court judge. I have tremendous admiration for the more than 50 years that the district court's experienced sitting on the federal bench, and it is against that background I say to this Court that the district court simply, when it reflects the Philmont issue, but now before this Court, the district court from the outset of this case was unwilling to recognize what is the plain facts of this case, and that is established. And what are those plain facts, Your Honor? They are the following, that in RCRA and in CERCLA, in RCRA and Section 3010 and in CERCLA and Section 103C requires the reporting of any facility at which hazardous substances or any regulated chemical has been ever handled or treated, managed in any regard. Let me, you know, there's a lot of generalities. I'm having trouble understanding where you're going. You've alleged the district court in your briefs, alleged the district court committed error. In fact. And you raised, what, seven different issues? Yes, Your Honor. All right. It would be helpful, I guess, is to start down those issues where you claim the court got it wrong. Maybe start with the one that you think you got the best shot at. Don't just go in order. Like, how about talk to one that you think you might actually win? We think we actually should win and prevail on all of the issues. I know. I know. You're a lawyer. So you can take them in any order you want. But I tell you, it would be more helpful to us if you took issues that you thought you might actually win. But you can do them in any order you so choose. The Fillmont facility is unquestionably and undeniably at every level a prohibited open dump under West Virginia law, and the district court committed plain error in its finding that it was not. It committed plain demonstrable.  Why? We have conclusion after conclusion. Like, pick something and tell us, like, why. That's exactly where I'm going, Your Honor. And my answer to your question is very direct. The district court found that the applicability provisions of the West Virginia Solid Waste Management Rule did not include the Fillmont facility. That is manifestly. Why? What did the court say? The court said that the provisions of the applicability rule, that the provisions of the first four sections of the applicability rule apply. They do not apply. They apply only to municipal landfills, that is, landfills that handle household wastes. Fillmont is not that. It never has been that. It never will be that. The applicability provision of the West Virginia Solid Waste Management Rule that applies to Cortland is number four. And it says expressly that that facility must comply not only with its original permit but with this new rule. The court made plain error when it concluded that the first four sections of that applicability provision applied to Fillmont. They do not and they never have because the rule expressly defines solid waste disposal facility, SWDF, to be a facility which handles household waste. It is a municipal landfill provision. It does not apply to industrial landfills. And in this landfill, Your Honor. Am I just on? Is this the argument you're making on page 65 of your brief? Is that? I beg your pardon, Your Honor. Is this the argument you're making? Is the one on page 65? I don't know. That you're citing the federal CFR to define? I guess I'm not sure I understand this. No. Maybe say it one more time. I beg your pardon, Your Honor. I didn't mean to interrupt. No, no. Just maybe say it one more time. I'm not following you at all. Okay. Sorry, just to give you that opportunity. We are talking here about the solid waste management rule, which is a problem. Let's not talk about rules. Let's talk about what the district court held and why it was error. And if you're having trouble, maybe you can relate it to what section of your brief you're arguing. The district court expressly found that the Philmont facility was not an open dump under West Virginia law. Plain finding. Straight up. That finding is the one I'm arguing, Your Honor, and it is manifestly incorrect. And what was the explanation the court gave for finding it? I'm sorry, Your Honor? What was the explanation the district court gave for finding it? The district court gave two explanations, and it's first, and these were the first time these issues appeared in the case. They were not raised by the defendants. They were raised by the district court itself in its final order. Okay. Well, tell us what they are. The issues were, number one, that the applicability provision of the solid waste management rule said that Philmont need only comply with its existing permit and did not need to comply with the new rule. That is manifestly incorrect. Number two, the district court found that the solid ---- Wait a minute, wait a minute. This is where the district court said that the West Virginia statute only applied after a certain date and that the Philmont activities had ceased. There were no ongoing activities after that day. Am I thinking about the right one? Yeah. No, Your Honor. Let me be clear and try to draw this position here. I am talking about the West Virginia solid waste management rule as it was promulgated in 1990s. But you don't understand our problem is you're not explaining what the ---- We need to understand what you think the district court did wrong. And in order to do that, you have to tell us what the district court did and then tell us why it was wrong. The district court ---- Now, if it's the issue relating to the effective date of a particular rule, then tell us that and why that was wrong. I am being as direct and as declarative as I can possibly be. The district court found that Philmont was not an open dump under the applicable provisions of West Virginia law. Those are the Solid Waste Management Act and the Solid Waste Management Rule. The district court then found and declared over seven pages of its opinion that in its opinion, the Solid Waste Management Rule promulgated in 1996 conflicted with the statute, the West Virginia statute, and was therefore preempted by the statute. The district court made those two findings. Finding one, that the applicability provision of the rule did not require Philmont to comply with the rule. Number two, it found that the rule itself and its other provisions, which clearly include Philmont, that there cannot be waste emanating from the facility into the environment. There cannot be releases from the waste. There has to be management facilities that protect against the very things that happened at Philmont that are not present at Philmont. None of those apply because the rule itself is in conflict with the statute. That finding is manifestly incorrect for two reasons, and they are compelling, compelling to this court. The district court raised this issue itself with no argument, no chance for Cortland to respond or address it. It raised it in a final order. And the answer is quite specific and addressed in our briefing detail. And the answer is the West Virginia legislature, by duly enacted legislation in West Virginia, declared that rule, the 1996 rule, to be consistent with their intent and enforceable and the applicable law of the state of West Virginia. And that was done for multiple reasons. It was done to correct earlier problems, and it was done as an express statement that the district court itself was totally unaware of. So the district court's finding that that solid waste management rule conflicted with the intent of the legislature in this case is addressed by express legislation duly enacted by the West Virginia General Assembly that says that's the case. What is the express legislation? Give me the statute. It's cited in our brief, Your Honor, and it was passed after the rule was enacted. You want me to just go find it in the brief? That's fine. That's totally fine. I'm happy to just go look or not, depending on your preference. I'm sorry, Your Honor. I do not know the page number. I can get it for you in a moment with the court's leave. That will be all right. Okay. You can go ahead. It doesn't make any difference to me. To be clear, I mean, it's addressed directly and expressly in the final order issued by the district court. It found, the district court found, that the West Virginia solid waste management rule was inconsistent with the West Virginia statute and therefore unenforceable and preemptive. What was wrong with that? What? What was wrong with that conclusion? Your Honor, the West Virginia General Assembly, by duly enacted legislation, declared that rule to be consistent with its intent and enforceable and the law of the state of West Virginia. So the General Assembly itself is the one that's contradicting the trial court, not the plaintiffs. The trial court was unaware. The district court was unaware of that legislation. Well, if it was unaware of the legislation, that means you didn't raise it. No, Your Honor, there was no opportunity to raise it. This issue was raised in the final order of the district court, not by the defendants. This is not an issue that the defendants raised and we failed to address. This is an issue that appeared in this case on the first instance in the district court's final order. And you didn't seek to do a motion to reconsider to point this out? Your Honor, it was very clear to the district court that it was moving on to Phase 2. That Phase 1 was over and our issues, such as they are, belong before this court, and Phase 2 was where we were going, and that was clear. There had been three previous denials of attempts to amend, and it was very clear in this case that you didn't have to necessarily amend the complaint or something, but if you thought the district court made an error of law and it was sui sponte introduced in this final order, it seems like ordinary practice and prudence would say, well, I'm going to at least try to raise it to the district court's view because we didn't have a chance to make that, because it was sprung on us at the last minute. The district court was very clear that this case was moving on to Phase 2, and after multiple years of this, you will find that we raised the issue in Phase 2. Was Phase 2 the remedy? No, Phase 2 was the remedial issues. That's what I said. That flowed directly from this consequence of whether it's an open government. And the court raised this in Phase 1 and its ruling on Phase 1? I'm, I'm, I'm. When did the court make this ruling that you're objecting to? In Phase 1. Yeah. Well, then what were you doing between Phase 1 and Phase 2? Why didn't you object? The case was still before the court. We did. In fact, you'll find in our briefs in Phase 2. Well, then the court did address it, and you did have a chance to argue it. I beg your pardon? That's all right. I didn't hear the question. Did the court address it? You were talking about you were caught totally by surprise, and that you, as if the, we're reviewing something that you never had a chance to respond to. But the fact is, if this was done at the end of Phase 1, you still had a chance at that point to argue, file briefs, reconsideration, even in connection with Phase 2. And I don't know if you did. Not motion for reconsideration, but we briefed the issue in Phase 2. Okay. We raised it before the district court in Phase 2. Okay. If you briefed it in Phase 2, then the court did have the right to, you had the right to present it, and the court considered your arguments, I'm sure. I have no idea whether it did. It's not addressed in the Phase 2 order, so I do not know what the court thinks about it. Well, while we hear you on rebuttal, I think your time is up here at this point. Your Honor? I'm sorry? Your clock, your red light is on. Oh, yes, Your Honor. And so we'll hear you on rebuttal. Thank you, Your Honor. Mr. Shelton. Police Court, I'm Martin Shelton for the Appellate Union Carbide. As an initial matter, I want to tell you that I've divided my time with my colleague, Patricia Bellows. She'll be handling the issues related to Cortland 4, the Clean Water Act issues, and I'll be handling the issues in Cortland 2, the 2019 case. Now, our response on this can be broken down into two main points. The first of these is that the — Speak up just a little bit. Yeah, I'll speak up. I apologize for that. The bulk of Cortland's arguments in their appeal fail due to the fact, due to a failure to show harm. So it's a failure to show an irreparable harm for the RCRA injunction, a failure to prove any harm to itself or to the general public for the nuisance. So are you responding to the argument that we just heard? Well, actually, I was going to do that second. Well, no, I'm just trying to get — we had a little confusion over exactly — Maybe it would be good for you — you can get to that, but it might be good for you to clarify what your position is on what was just argued about, the applicability of the — Absolutely, Your Honor, because that was the second point, that the court correctly found that Philmont was not an open dump. And as a starting point, and I think you've probably read this from reading the briefs, it's important to remember that Union Carbide elected to close the Philmont landfill in 1987, okay? And that matters because when the court went through and analyzed this, it's a clear case of statutory construction. It was looking at the West Virginia Solid Waste Management Act, and that act was passed in 1983. And under that act, it specifically said, everybody who has a landfill right now can continue to operate as you are until June 10, 1988. At that point, you are going to be subject to this act, these provisions are going to become applicable, and you need to proceed under this act. Now, any landfill that closed prior to that June 10, 1988 date was not subject to the act. They were no longer an active landfill. And these West Virginia rules, the solid waste management rules that were enacted pursuant to the statute, they were not done until after 1988. They're done by the agency to effectuate what was in the statute. You closed down in 87? Yeah, and the landfill was closed down in 87. And it was — every landfill that was out there had a choice then. You could either close and not be regulated, or if you chose to proceed, you had to meet these new rules. So for this facility, Union Carbide chose to shut it down, and they did. And so when these rules that are enacted years after that — And they're enacted under a different statute? Well, no, they're enacted pursuant to the Solid Waste Management Act, but what happens is the legislature enacts a statute and says rules are going to be promulgated, and those are actually done by the agency. They create the rules, and then they're approved, and they go into effect. So it's a different process. So what do you understand? Opposing counsel was arguing that the General Assembly of West Virginia came back at some later date and made a rule, and this rule revoked the provisions of the earlier act that gave you, you know, a safe harbor after 1988. I mean, that's — I thought that's what they were arguing, but I wasn't quite sure. I think that is what they're arguing. That's not what the statute says, and it's also not what the regulations say. The regulations that came later very clearly said that these regulations will only apply to landfills which continue to receive waste after June 2, 1996, which is almost a decade after Fillmont was closed. They were not receiving waste after they closed in 1987, so they certainly were not receiving waste after June of 1996 when the rules became active. And this is the basis of the district court saying that neither the statute or the rules applied to Fillmont because neither the statute or the rules apply retroactively. Neither one of them contained a statement saying that they would apply retroactively. In fact, they say the opposite. When the statute says — you know, the statute was passed in 83, but it says this isn't going to apply until 1988. When the rules came into effect, it said we only apply to things that happen after 1996. So there's no retroactive application. And with the facility is closed, there's no retroactive application. These rules do not apply to it with respect to the — with respect to solid waste management. Did the court find that the rule contradicted the statute? The concept of it conflicting? Yeah. So I don't think they conflict, quite honestly. Pardon me? I agree that the court said that it appears that the rule and the statute are in conflict. Okay? And it has to do with the definition of how they define disposal. So the statute defines — the statute defines an open dump as solid waste disposal which does not have a permit. And then solid waste disposal is defined as the practice of disposing of solid waste. Okay? The rules define disposal essentially as any addition of waste into the environment. So there's a little bit of a difference there because if you actually analyze the language, the practice of, and the court went through hundreds of instances of that phrase in West Virginia code, that always requires some human activity to move it along. In other words, you'd have to — Why is the court construing the rule if it's not applicable? Well, the court first went through the analysis to say it was inapplicable, and then, in my opinion, went through to say, well, if it was applicable, it still wouldn't apply because, by definition, this is not — it's still not an open dump. In other words, kind of a belt and suspenders approach to a — you know, I don't believe — so, first of all, I would say I don't believe they're in conflict because if you look at any facility that was operating after 1988, they are operating when the law is active. They are in the practice of disposing of solid waste. If you look at the rules, they're going to apply to anything which has received waste and is their disposing of waste after 1996. When you get to that point where all these laws apply, they're not in conflict anymore because they're both about human activity of disposing of the waste at these facilities. They're both going to apply. This really only comes up in facilities to which the statute and the regulations don't apply because they closed down before they came into effect. And I believe that you're — I understand what you're asking, Your Honor, and I believe that the court could have, and maybe it would be easier for us in this moment, if he had just stopped with saying it's inapplicable. But he went on to say, well, even if it wasn't applicable, it doesn't matter because this still wouldn't be an open dump under the statute. And where the statute and the regulations conflict, the statute controls. Can you respond to what I think is the argument that your colleague made, which is on 71 of his brief, where he says, Section 64-3-1A of the House Bill, which is included as Attachment 3, adopted and approved the entire 1996 revised rule. But when I look at 64-3-1A, it talks about rules from 1995, not 1996, and it talks about air pollutants. I guess I like fundamentally don't understand the argument. And you're an officer of the court, so you could just say I don't either. But do you have any idea what I'm supposed to do with this? To be quite honest with you, Your Honor, I have no clue. Okay. I'll ask your colleague. I literally have no idea. I don't think that argument is relevant to what the court did and what the court determined. I mean, I think the court made a very clear determination about what applied, what the rules were. And we did actually argue this in Phase 1. We presented a whole presentation about these statutes and what applied and what didn't because we were making the argument that these rules didn't apply. So if they had a problem with that, I don't know why it wasn't raised then. So you made the argument the rule didn't apply because of the closing date of the solid waste management statute. There was a whole issue about the fact that Philmont had operated under a health department permit and it had been closed. And as part of that, we went through and looked at all these statutes, what had applied before. We dug up old copies of them and presented all this to the court as the argument about what the statutory history was and why those statutes didn't apply. In other words, all these environmental statutes came into being with, like, deadlines. It's like you can do what you've been doing for so long up to this point. From that point forward, you can't do it. So, for instance, the reason it's not on appeal here, but the reason why there was a finding it wasn't a hazardous waste facility, is because there's no evidence of any hazardous waste going in the facility after a November 1980 deadline. All these statutes have deadlines and they come into effect because there's past conduct that's been happening. And the expectation is stop the conduct, or if you're going to keep going, you're going to do it under this new regime of new rules. And that's the way they're set up. And what the court did was look at this and say, yes, that's what happened here. These statutes came online after Philmont closed, therefore it doesn't apply to Philmont. And that should be where it stops, in my opinion. And so I do want to address, you've asked about some of the under the circle, the kayak issue. I do want to jump really quickly to that, because when I start off the first time, it's just to say there's no showing of harm. So are we in number two or number four now? Well, these are all number two. So everything I'm talking about is number two, if that makes it easy. But we divide the time. As easy as it can get. I agree. It was even harder at trial. So under the circle claim, in order to recover costs, you have to show the necessary. And the showing of necessary means it has to be somehow related to the threat or the harm for the cost you're trying to seek. In other words, you need to be able to show that this cost. The kayak trip was in the northern drainage ditch or the southern drainage ditch, or David, where was it? It was in the northern. Well, actually, the kayak trip was in Ward's Branch, which the northern drainage ditch flows towards. So it was on the north side of the Philmont landfill, and Cortland is on the south side of the Philmont landfill. So the northern drainage ditch is here, and Cortland is down here. And everything in between my hands would be the landfill. And the water flows this way, away from Cortland. I'm looking at the map. Ward's Branch flows under the interstate. Under the interstate, then it turns and flows basically back towards the interstate. It does a loop. So that was the kayak trip. Yeah, and so the thing with the kayak trip is that there was no relationship between sampling surface water on this north side of Philmont with the threat of harm to groundwater on the south side of Philmont. There's a couple reasons for that. One is, just like with the concept of No Standing for Clean Water Act, that surface water is flowing away from Cortland, never comes through Cortland. And so there's really no way it's going to have any sort of influence on groundwater. Also need to know that groundwater here is 20 to 30 feet below the surface. So it's not like the water is all connected. There's dirt and rocks and everything in between that. So unless this surface water sort of magically jumped up and then got underground 1,000 yards upstream, there's no relationship between any of those, and that's really what the court was finding, is that there's no cognizable relationship between this sampling that you did and the threat of harm. And that's why he denied those costs. And, well, actually my time's up, so if there are any questions, I'll stop. Okay, thank you. We'll hear from Ms. Bell. Thank you, Your Honor. And may it please the Court, Patricia Bellow on behalf of Union Carbide Corporation, and I am going to address the issues that are on appeal here today in Cortland 4. So as it relates to the Clean Water Act, and as you heard from Mr. Donovan, relating to the southern boundary ditch. Two points that I want to make from the outside with regard to the district court's ruling. The first is, with regard to the southern boundary ditch, the district court correctly found that any civil penalty as to the southern boundary ditch had to be based on an actual unpermitted discharge of stormwater. And what it did was it found that there were three violations of the Clean Water Act under 33 U.S.C. 1311A and 1342P. And it found that in as much as it specifically found Union Carbide was discharging stormwater associated with industrial activity on a single day in March 2022 into the southern boundary ditch without a permit. And it found that on that day, Cortland's expert observed three points, three separate points. It was a shallow drainage ditch that channeled from Philmont into the southern boundary ditch, and then also two culverts that led out of Massey. And if I understand what Cortland is to. What do you understand the plaintiff says they were trying to claim? What were they trying to get here? Yes, Your Honor. If I understand what Cortland is arguing, I believe that there's essentially two things. The first is that they seem to be making the argument that the violation here is actually Union Carbide's lack of a permit, not the actual discharge of a pollutant into waters of the United States. And so to that point, as the district court correctly found, the lack of a permit itself is not in and of itself the violation of the Clean Water Act. It's the discharge of a pollutant without the permit that creates the violation. And that's specifically from 33 U.S.C. 1311A. And also when we look at this separate distinction, which is what Cortland is claiming, is that these discharges are associated with industrial activity at Philmont. The EPA has actually defined stormwater discharges in that context under 40 CFR section 122.26B14, again, as a discharge from any conveyance. And so the key there is not the lack of the permit. It's the physical discharge without the permit. So the district court gave some sort of recovery. I don't know what the dollar amount was for the three discharges on one day.  And the plaintiffs had asked for something for every day for a long time. Correct. What the district court did is it gave actually the maximum civil penalty available for those three violations that it found as it related to March 20th of 2022 and Mr. Simonton's observation on that day. But what Cortland is asking for here, and we believe incorrectly, in accordance with what the district court found, is basically a violation, as I understand it, of every day from, I believe their brief says, 1991 to the present. And the district court noted in its decision part of the flaw in that discussion, which was that to show a violation, again, there has to be a discharge. And when we're talking about stormwater, we're talking about water that has come from a rainstorm and it hits the ground and it runs off as a stormwater discharge. We're not talking about a lot of the things that are in Cortland's brief, I think, actually cite to seeps and are discussing more so groundwater than actual stormwater. And so what the district court noted is if we take Cortland's argument to its natural conclusion and they say, well, there's a violation every day from 1991 to the present, even if we take that, we know that there wasn't rainfall every day from 1991 from the present. So it's not possible for them to have been in violation. The district court's decision here, just one on the basis of proof. Plaintiff, you prove these discharges on this one day, but you don't have proof of all the others you claim. I believe that's right. And to clarify, too, Your Honor, and I think this is part of what Cortland is arguing, at 363 of the district court's decision, the district court does make a finding of an ongoing violation as it relates to the southern boundary ditch. But that finding of an ongoing violation is separate and distinct from what the district court then did in determining its violations for assessment of civil penalties. That finding of an ongoing violation is actually in accordance with 1365A and the line of decisions in the Waltney matter, which is actually a finding of subject matter jurisdiction, which requires that before a court can even decide if there is a violation of the Clean Water Act, it has to determine if it has subject matter jurisdiction. And there the plaintiff must prove that the violation continues on or after the date the complaint is filed or the evidence from which a reasonable trier of fact could find a continuing likelihood of a reoccurrence in intermittent or sporadic violations. So the court took this in phases. It found subject matter jurisdiction, and then it said, based on what Dr. Simonton saw on that single day in March of 2022, I find three violations, and based on those violations is what in phase two it ultimately assessed civil penalties for. The second piece to, I believe, what Cortland is arguing in its brief is actually an evidentiary issue, and it relates to a claim that they assert the district court improperly excluded rainfall data from the phase two trial. And I think first and foremost, when we're talking about the exclusion of evidence, as this court is well aware, it's an abuse of discretion standard, and the question is, did the district court act arbitrarily or irrationally in rendering its decision? And a review of the district court's phase two order, particularly footnote 11, that specifically addresses this point indicates that the district court was meticulous and deliberate in its rulings. The issue here was that phase one from the start, when the court bifurcated these claims, was always to be on liability. Phase two, as this court has noted, I think earlier this morning, was always to be on remedies or on damages. And so the question of the rainfall data and the proof of that in terms of how many violations of a Clean Water Act may exist was something that the district court noted Cortland should have and very well could have admitted during phase one of the trial, and they chose not to. And so the issue that we have here is that the district court correctly recognized that this evidentiary issue, as Cortland raises it in its brief, was really one that just missed the boat. It failed to elicit the necessary evidence in phase one, and as a result, it improperly tried to do so in phase two, and that's why the district court correctly precluded that from happening. And for that reason, Your Honors, we would ask that this court affirm both the decisions of the district court in both Cortland 2 and in Cortland 4, and unless the court has any questions, I will sit back down. All right, thank you. Thank you. All right, Mr. Donovan. Thank you. Equipped now, Your Honors, with the actual page numbers, I will ask this court to focus its attention on one fact. The claim before the district court was that the Philmont facility is a prohibited open dump under West Virginia law. Currently, it is a prohibited open dump under West Virginia law. The dialogue, the discussion, the doublespeak here about what happened in 88, what happened in 87, what happened in 80 is irrelevant. The question before the court, the claim before the court is, is the Philmont facility a prohibited open dump under existing West Virginia law, and the answer is unequivocally and undeniably yes. And the reason for that answer is very clear and set forth both in pages beginning on page, to be clear here, beginning on page 67 of our original brief in Cortland 2 and in the reply brief beginning on page 13. And Your Honors' question earlier about the West Virginia legislation, it expressly addresses the rules adopted by the West Virginia Department of Environmental Protection under the Solid Waste Management Act, and that again is in pages 97 through 90, I beg your pardon, Your Honor, page 67 through pages 69 of the original brief. In that legislation, the West Virginia legislature said the solid I'm sorry, can I go back, because when I looked at that sort of portion of your brief, and you say 64-3-1A, and I look at that, and that's talking about air stuff, I don't know why this, I mean, there are like so many questions here, I can't begin to get my head around it, but maybe just answer this one, like when I look at, you cite 63-1A, and I look at that, and that talks about some rules from 1995 about airplanes. Those are the rules, Your Honor. No, not the air pollution rules. I mean, I'm reading it. You said it's from 1996. This says 1995. You said it involves non-air pollutants. This just says air pollutants, right? It doesn't talk about, I mean, maybe I'm supposed to go find it somewhere else, but like this can't be what you say it is. Your Honor, on page 19 of our response brief, we addressed this issue and identified it to the court and apologized. And footnote number three, it says the section was taken. Where am I again now? Help me. Page 19 of our response brief in Courtland II, of our reply brief. At footnote number three, we said this section was incorrectly identified as section 64-3-1 in appellant's opening brief. Appellant counsel apologizes to the court for this typographical error. The proper section is referred on page 19 of our brief, and it is an express enactment of the West Virginia legislature that clearly addresses the West Virginia Solid Waste Management Rule amendments that began in 1995 and took effect in 1996, and the legislature declares them to be consistent with its intent, consistent with the statute and enforceable law of West Virginia. Opposing counsel says that under the. I'm sorry, Your Honor, I didn't hear. Opposing counsel says, as I understand it, under the Solid Waste Management Act, there was an effect of safe harbor granted for folks that ceased operations before 1988, and I understood your argument to be that this later enactment changed that. Your Honor, there is no relevance at all to any enactment in 1988. It is entirely irrelevant. The West Virginia Solid Waste Management Rule applies to all solid waste management facilities in West Virginia, open, closed, permitted, unpermitted, or otherwise. It applies to every solid waste management facility in the State, period. And there's no doubt about that. What is the cite for that? The rule itself. If I find somebody other than your experience to tell me that, what do I look at? That goes to the very applicability provisions. The rule itself defines solid waste management facilities and states its applicability. Is there anything other than the rule you want me to look at? I mean, I'll go try to find the rules wherever they might be, but. The rule is cited repeatedly at pages. Well, the adoption of the rule or the authorization of the rule. Yes. Is your view that if the legislature authorizes the rule in West Virginia, that it thereafter trumps the statute? So the statute is therefore no longer valid? If they're in conflict, if they authorize a legislative rule, does that trump the statute, in your view? In fact, the statute itself authorizes the rule. No, no. Okay. You can answer a different question if you like, or you can answer the question that I asked, which is, if a legislative rule is authorized and it is in conflict with the statute that it purports to interpret, does it trump the statute? I think that question is internally inconsistent. The question before the Court is whether the rule violates the intent of the West Virginia legislature. And nobody but the West Virginia legislature can. So the answer is you will not answer the question? I am trying to, Your Honor. The question is, you say it's in conflict. I'm saying that conflict can only exist if the West Virginia legislature says that that rule conflicts with its intent. And who is in charge of the intent? There is no principle better established in the preemption of the law than that the legislature is the master of the preemptive effects of its own master. Let me ask you whether that's even relevant. I'm looking at Section 10, subsection A, 221510, subsection A. And this seems to create that safe harbor that Judge Agee was referring to. It basically says April 1, 1988. It doesn't apply to anybody who was before then who was operating with a permit. In Section 10A? No, Your Honor. 10A. That's what I'm reading. Tell me why.  Section 10A. They closed this dump in 87. That was a factual finding. No, Your Honor. Section 10A says that, expressly says that any open dump in the State prohibits the app, any landowner, from maintaining an open dump in the State. Where does it say that? In Section 10A of the statute. That's what it says. Any person, no person may create, maintain, operate an open dump, and any landowner in West Virginia may not allow an open dump to exist on his property. It says open dumps operated prior to April 1, 1988 by a landowner or tenant for disposal of solid waste, et cetera, are not in violation of this section. If the open dump was not in violation at all on January 8, January 1, 1988, and unauthorized dumps which were created by unknown persons are not in violation of this section. Yes. But it does not exempt from the applicable. And it defines an open dump, a prohibited open dump under this statute as one that doesn't have a permit. No. It's defined three separate alternative ways, Your Honor. An open dump is any unpermitted facility, any facility that is not regulated, or any facility that is not adequately protective of the environment. It is defined in the alternative both in the definitional section of the statute and in the definitional. So you think that a dump that was preexisting dump that was closed in 1987 is subject to this statute? A preexisting dump that was closed in 87, in 27, in 47 is subject to this statute. You say it's regulated? Just simply ask. You argue it's regulated by this statute? Yes, it does, Your Honor. Well, that's a statutory interpretation. We'll take a look at that. The rule itself says that, Your Honor. Thank you. Thank you. May I ask the Court's indulgence for one minute to address Judge Neumeier? On what? I would like to address you, Your Honor, just for one minute, and I want to say the following. Yes, sir. This is likely my last argument of my legal career in front of the United States Court of Appeals, so I take this opportunity to say this to you, that myself and every other alumni of my alma mater, Notre Dame, who have come to the profession of the practice of law, come and bear with them an admiration for your legacy and your impact on the law, and it is an honor and a privilege to have my last argument before you. Well, that's very nice. I accept that, and it's very kind of you to say. Thank you, and congratulations for your long service. Thank you. You can come down and greet counsel and adjourn. We'll adjourn for the day and greet counsel. This Honorable Court stands adjourned until tomorrow morning. God save the United States and this Honorable Court.
judges: Paul V. Niemeyer, G. Steven Agee, Julius N. Richardson